IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OSCAR SMITH, JR. and | : | CIVIL ACTION |
| O. SMITH AGENCY, INC. | : | |
| | : | |
| v. | : | |
| | : | |
| THE ALLSTATE CORPORATION | : | |
| and THE ALLSTATE INSURANCE | : | |
| COMPANY | : | NO. 12-0144 |

-----------------------

| | | |
|---|---|---|
| GREG BURRIS and | : | CIVIL ACTION |
| THE GREG BURRIS AGENCY | : | |
| | : | |
| v. | : | |
| | : | |
| THE ALLSTATE CORPORATION | : | |
| and THE ALLSTATE INSURANCE | : | |
| COMPANY | : | NO. 12-0145 |

## MEMORANDUM OPINION

Savage, J.                                                                              March 12, 2013

In their virtually identical two-count amended complaints, the plaintiffs, Oscar Smith, Jr. and Greg Burris, individually and on behalf of their respective agencies, assert causes of action for "discrimination in contracting" in violation of 42 U.S.C. § 1981 and for breach of contract under Pennsylvania law.[1] They claim that the defendants, The Allstate Corporation and The Allstate Insurance Company (collectively, "Allstate"), terminated their agency agreements because they were African Americans. They also contend that Allstate breached their contracts when it did not provide them with contractually mandated reviews that would have enabled them to explain and

---

[1] By order of Chief Judge Joyner, the *Burris* and *Smith* cases, which were filed on the same day, were consolidated for pre-trial purposes.

remediate deficiencies that Allstate relied upon as the grounds for terminating their agency relationships.

Plaintiffs, who had each signed exclusive agency agreements with Allstate to sell Allstate products, contend that after they built their businesses under the agency relationship, Allstate established customer satisfaction standards that set them up to fail. When the plaintiffs did not meet these standards, Allstate terminated the agreements and, according to the plaintiffs, forced them to sell their books of business to Allstate-approved agents at below-market rates.

Moving for summary judgment, Allstate argues that the plaintiffs have not produced any evidence of purposeful racial discrimination or of a breach of contract. Thus, it contends it is entitled to judgment as a matter of law.

After carefully reviewing the record and drawing all inferences in favor of the plaintiffs, we conclude that a reasonable jury could not conclude that Allstate purposefully terminated the plaintiffs' agency agreements because they were African Americans, but could find that Allstate breached the agreements. Therefore, we shall grant the summary judgment motion in part and deny it in part.

**Background**

In June of 2000, Allstate changed its business model for selling its insurance products. It terminated its employer-employee relationships with its incumbent agents in favor of an independent contractor program. The agents, who were Allstate employees at the time, were given three options: (1) become independent contractors, entering into an Allstate Exclusive Agency Agreement ("agency agreement") to sell exclusively Allstate products; (2) become temporary independent contractors while

arranging to sell the existing books of business they had generated as Allstate employees; or, (3) accept a severance package and relinquish their interest in the existing businesses.

Smith and Burris opted to become independent contractors. They each signed an Allstate R3001A Exclusive Agency Agreement, agreeing to sell exclusively Allstate products. The agreement, which superseded all "prior employment, agency, or other agreement[s]" between Allstate and the agency, authorized the agency to sell Allstate products as an independent contractor.[2] It provided that Allstate owned all business produced during the term of the agreement.[3]

Pertinent to this litigation, the agency agreed to "meet certain business objectives established by [Allstate] in the areas of profitability, growth, retention, customer satisfaction and customer service"[4] Additionally, the Exclusive Agent Independent Contract Manuals were expressly incorporated into the agreement.[5]

The agreement was terminable for cause, by mutual agreement, or unilaterally by either party upon ninety-days notice.[6] The agreement would automatically terminate upon the occurrence of certain enumerated events,[7] none of which are applicable here.

---

[2] Agmt., I.A -I.C.

[3] *Id.* at I.A.

[4] *Id.* at II.B.

[5] *Id.* at I.D.

[6] *Id.* at XVII.B.

[7] *Id.* at XVII.A.

The plaintiffs claim that they achieved "exemplary results."[8] Smith built and maintained a book of business that generated approximately $3,000,000 per year in insurance premiums; and, Burris, approximately $1,000,000 per year.[9] Customer retention rates for both agencies were at or above the national and regional averages over a ten-year period. Smith averaged a ninety-two percent retention rate, and Burris had an eighty-seven percent retention rate average.[10]

Allstate formally evaluated each of its agencies and produced an annual Agency Status Review, which compared the agency's performance against Allstate's expected results for that agency based on a number of factors, including the agency's productivity, retention, and profitability. Before 2007, Allstate measured customer satisfaction primarily by retention rates. In 2007, Allstate implemented the Agency Loyalty Index ("ALI") to gauge customer satisfaction by using questionnaires mailed to each agency's clients. In March 2009, Allstate informed its agents that it would factor the ALI into its calculation of the expected results analysis done the preceding year. When it added the ALI, Allstate began phasing out the Agency Status Review in favor of the Expected Results Portal, an internet-based review system that incorporated the annual formal conversation between the agent and his/her Field Sales Leaders.[11] In other words, it replaced the paper report with a digital one.

---

[8] Burris Am. Compl. ¶ 32; Smith Am. Compl. ¶ 39.

[9] Burris Am. Compl. ¶ 33; Smith Am. Compl. ¶ 40.

[10] Burris Am. Compl. ¶ 38; Smith Am. Compl. ¶ 48.

[11] Defs.' Ex. 9. The purpose of the Field Sales Leader is to assist in the distribution, support, sales, and service of Allstate Insurance products. They also work with Allstate agencies regarding product selection and consulting to increase sales, generate profitable premium growth and increase market share in the financial services, property and casualty areas.

The Agency Status Review and the Expected Results Portal provided a formal evaluation of the agency by providing feedback concerning the agency's actual business results and the overall business relationship with Allstate. The primary focus of the review was a comparison of the agency's actual results to the goals that Allstate had set. The Expected Results Portal was implemented to provide agents with greater access to the current measurement categories, the expected results, the agency's current results, and an on-pace indicator.[12]

Based upon the 2009 ALI survey, both the Burris and the Smith agencies scored below the benchmark established by Allstate. Both agencies received letters from Allstate warning them that "failure to achieve a score of 60 or higher in the 2010 survey could jeopardize [their] relationship[s] with Allstate."[13] To boost the responses to the surveys, Smith hired a telemarketing vendor to contact his customers to explain the ALI survey and the need to respond to it. Burris and an employee called each customer to encourage them to respond to the survey.[14] Despite these efforts, Burris and Smith again failed to score sixty or higher on the 2010 ALI. They attribute the negative customer feedback to Allstate's increasing premiums, not to their lack of customer service. They complain that the surveys failed to adjust for demographics, including the ethnic and racial make-up of the customer bases. They argue that the low scores were not an accurate measurement of their overall performances, especially in light of their

---

[12] *Id.* The Portal displays monthly cumulative business results with the exception of the ALI, which is an annual score. The monthly cumulative results are used to track whether the agency is achieving results on pace with Allstate's goals in the various expected results categories.

[13] Burris Am. Compl. ¶ 54; Smith Am. Compl. ¶ 59.

[14] Burris Am. Compl. ¶ 55; Smith Am. Compl. ¶ 61.

high retention rates.

Citing the low ALI scores, Allstate terminated the Smith and Burris agency agreements on February 21, 2011 and August 30, 2011, respectively.[15] Once Allstate terminated the agreements, the only options Smith and Burris had were to sell their books of business to an Allstate-approved buyer or accept a severance and forfeit their books to Allstate. They contend they were compelled to sell their books at below-market rates.

Smith and Burris, African Americans, claim that their agencies were the only Pennsylvania agencies whose agreements were terminated because of low ALI scores. They assert that Allstate's decision to terminate the agreements in each case was race based, and the agreements were terminated because they were African Americans. They also contend that Allstate set them up to fall short of Allstate's established goal by failing to provide the support mandated by the agreements.

**Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.,* 340 F.3d 144, 159-60 (3d Cir. 2003).

---

[15] Burris Am. Compl. ¶ 60; Smith Am. Compl. ¶ 68.

6

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party. Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted).

Drawing all inferences in favor of Burris and Smith, a reasonable jury could find that Allstate breached the contracts for the purpose of causing them to lose their business. With respect to their section 1981 cause of action, there is no evidence from which the jury could conclude that Allstate acted purposely to discriminate against them because they are African Americans. Rather, the jury could decide that Allstate, regardless of race, wanted the businesses, and did not perform its obligation under the contracts as a means to accomplish its goal.

**Discrimination in Contracting – 42 U.S.C. § 1981**

The plaintiffs claim that they, as African Americans, were disparately impacted by Allstate's reliance on ALI scores. They challenge Allstate's use of the ALI in measuring customer satisfaction in minority communities, claiming that the ALI survey had inherent

7

flaws in the design, dissemination and processing, which Allstate knew or should have known discriminated against minority agents.[16] Specifically, they assert that "[m]embers of an urban minority community are largely distrustful and are more likely to disregard mailed surveys;"[17] "Allstate failed to differentiate between responses critical of decisions made by Allstate from those critical of the agency or the agent;"[18] "[i]n evaluating the responses, Allstate failed to account for the inherent nonresponsive issues in a predominant [sic] minority clientele;"[19] and "Allstate failed to compare the survey score to the [plaintiffs'] retention rate[s]."[20] Furthermore, Smith and Burris allege that "Allstate knew these flaws discriminated against minority agents as is demonstrated by its modification once it was determined that the ALI survey also negatively impacted non-minority agents serving predominately minority communities."[21]

To recover under section 1981, plaintiffs cannot simply assert that the ALI has a disproportionate effect on certain minorities. To prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decision-maker adopted the policy "because of," not merely "in spite of" the adverse effects upon an identifiable group. *Pryor v. NCAA*, 288 F.3d 548, 562 (3d Cir. 2002) (quoting *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)). An awareness of the consequences of a

---

[16] Burris Am. Compl. ¶ 81; Smith Am. Compl. ¶ 90.

[17] Burris Am. Compl. ¶ 83; Smith Am. Compl. ¶ 92.

[18] Burris Am. Compl. ¶ 85; Smith Am. Compl. ¶ 94.

[19] Burris Am. Compl. ¶ 86; Smith Am. Compl. ¶ 95.

[20] Burris Am. Compl. ¶ 87; Smith Am. Compl. ¶ 96.

[21] Burris Am. Compl. ¶ 88; Smith Am. Compl. ¶ 97.

neutral policy is not sufficient. *Id.* (citation omitted). "Determining whether invidious discriminatory purpose was a motivating factor [in the adoption of a facially neutral policy] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 563 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977)). Among the factors to be considered in assessing discriminatory purpose are: (1) the impact of the action and whether it affects one race more than another; (2) the historical background; (3) the sequence of events leading up to the decision; (4) any departures from the normal procedural sequence; and (5) the administrative history, particularly contemporary statements from the decision-making body. *Id.* (citations omitted).

Plaintiffs contend that the surveys discriminated against minority agents servicing minority customers. This contention is not supported by any evidence. In fact, the evidence is to the contrary. The surveys were applied to and impacted all Allstate agents servicing minority and non-minority customers. They were not aimed at minority agents. Thus, we conclude that Smith and Burris have failed to establish a viable discrimination claim based upon a disparate impact theory.

The plaintiffs also claim that they were disparately treated by Allstate. They contend that Field Sales Leaders failed to assist them[22] because they were African Americans and they were the only two agents terminated in Pennsylvania on the basis of low ALI scores.[23]

---

[22] Burris Am. Compl. ¶¶ 68, 89; Smith Am. Compl. ¶¶ 76, 98.

[23] Burris Am. Compl. ¶ 90; Smith Am. Compl. ¶ 99.

9

Section 1981 provides a cause of action only for *purposeful* disparate treatment. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 388-91 (1982); *Pryor*, 288 F.3d at 562. Accordingly, the core of a section 1981 action is *intentional* discrimination.

Where, as here, there is no direct evidence of discrimination, the plaintiffs must initially establish a *prima facie* case from which discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To make out a *prima facie* case of intentional racial discrimination under section 1981, the plaintiffs must show that: (1) they belong to a racial minority; (2) the discrimination involved the right to make and enforce contracts; and, (3) the defendants had an intent to discriminate on the basis of race. *Estate of Oliva v. N.J., Dep't of Law & Pub. Safety, Div. of State Police*, 604 F.3d 788, 797 (3d Cir. 2010).

There is no question that the plaintiffs have satisfied the first two elements. As African Americans, they are members of a protected class. Each had a contract, an Exclusive Agency Agreement, with Allstate. However, they have not established the third element. They have presented no evidence, direct or indirect, that Allstate had any intent to discriminate against them on the basis of their race.

One's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for a finding of intentional discrimination. *E.E.O.C. v. La. Office of Cmty. Servs.,* 47 F.3d 1438, 1448 (5th Cir. 1995). Direct or indirect evidence of

intentional racial discrimination must be presented. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267-68 (3d Cir. 2010).

The plaintiffs complain that the Field Sales Leaders failed to do their jobs. They contend that despite their responsibility to meet and discuss the agencies' poor performance and work with agents to remedy failures in achieving Allstate's business objectives, these leaders did not do so.[24] According to the plaintiffs, the Field Sales Leaders and their supervisors spent more time recruiting new agents than assisting existing ones.

There has been no evidence produced showing that this failure was aimed at any one group of agents. It was universal, affecting agents across-the-board. There is no evidence that the Field Sales Leaders' failure to meet with agents was calculated to impair the performance of agents of a particular race, gender, or other distinguishing characteristic. Nor is there any evidence that it impacted any particular group of agents. Thus, the plaintiffs cannot show that Allstate intentionally discriminated against them because they were African Americans.

Plaintiffs also claim that the fact that failing non-minority comparator agents in plaintiffs' geographic area were not terminated demonstrates disparate treatment.[25] The evidence does not support this claim.

---

[24] Burris Am. Compl. ¶ 105; Smith Am. Compl. ¶ 114.

[25] Burris Am. Compl. ¶¶ 66-71; Smith Am. Compl. ¶¶ 74-79.

In the 2009 Agency Status Review, the first year ALI was included as a critical factor in measuring performance, Smith and Burris were informed of the importance of the ALI after they failed to achieve satisfactory ALI scores:

> Achieving high levels of loyalty and customer satisfaction are important Allstate business objectives and are critical elements of Allstate's overall business strategy. The Agency Loyalty Index (ALI) is a critical measurement tool for evaluating the quality of customer service your agency delivers to Allstate customers.
>
> Your agency has failed to meet the current minimum acceptable ALI score and improvements need to be made in your agency to reverse this trend. While it remains your responsibility to achieve the minimum ALI standard this year, at your request, I am available to consult with you and your agency to help you establish a plan and processes to achieve this result. Failure to address this deficiency and make sustained improvements in the areas of customer loyalty and satisfaction could jeopardize your relationship with Allstate in future years.[26]

In 2011, the Expected Results Program was updated to "deliver a standardized countrywide approach to address agencies that constantly underperform."[27] The Expected Results and Agency Loyalty Index guide issued by Allstate to Field Sales Leaders included a provision that "Agencies with a score below 60 for three or four consecutive years will receive a notice of termination resulting from underperformance in customer satisfaction and customer loyalty."[28]

The contention that two non-minority Allstate agents, Bruce Datil and Carmen Ezzo, were not terminated due to low ALI scores is contradicted by the undisputed evidence. In three consecutive years, Smith and Burris scored below the established

---

[26] Defs.' Ex. 18.

[27] Defs.' Ex. 42.

[28] Defs.' Ex. 42.

minimum score of 60. From 2008 to 2010, Burris scored 40, 50 and 49. Smith scored 58, 58 and 46. On the basis of these scores, Allstate terminated their Exclusive Agency Agreements pursuant to section XVII.B.2, for "failure to achieve business objectives established by Allstate, specific to customer loyalty."[29]

The Datil and Ezzo agencies did not score lower than 60 on the ALI survey for three consecutive years. From 2008 to 2011, Datil scored 61, 57, 52 and 60; Ezzo's two agencies scored 61, 64, 58 and 55, and 70, 75, 60 and 65, respectively. Thus, Datil and Ezzo are not proper comparators because they, unlike Smith and Burris, did not score below 60 in these consecutive years.

Smith and Burris have presented no evidence that non-African Americans were treated differently. Because Smith and Burris have failed to establish a *prima facie* case of discrimination, Allstate is entitled to summary judgment on the discrimination claim.

## Breach of Contract

Smith and Burris allege that Allstate breached the agency agreements when it: (1) failed to conduct the formal annual reviews required by the Independent Contractor Manual, which was incorporated into the agreements; (2) failed to inform them of ALI's significant role as a key business objective critical to their continued relationship with Allstate, as evidenced through the May 23, 2007 memorandum regarding 2008 Customer Experience Goals,[30] the December 4, 2009 memorandum reporting on 2009 Agency Customer Loyalty Survey Results,[31] and the December 6, 2010 memorandum

---

[29] Defs.' Ex. 43 and 45.

[30] Defs.' Ex. 31.

[31] Defs.' Ex. 29.

reporting on 2010 Agency Customer Loyalty Survey Results;[32] (3) failed to install ALI score improvement programs that were set forth in various leadership guides, including the 2009 Northeast Region ALI Improvement Strategy,[33] the 2009 Opportunity Area Guide entitled "Strengthening the Agency Customer Experience,"[34] the March 3, 2009 PowerPoint entitled "Agency Sales & Customer Service - Customer Focused Reinvention,"[35] the Expected Results and Agency Loyalty Index December 2010,[36] and the 2011 Expected Results Program Leadership Guide;[37] and (4) failed to provide the annual and semi-annual reviews and notices required by the 2011 Independent Contractor manual,[38] which was incorporated into the agency agreement.

The three elements of a breach of contract cause of action are: (1) the existence of a contract; (2) breach of a duty imposed by the contract; and, (3) resulting damages. *McShea v. City of Phila.,* 995 A.2d 334, 340 (Pa. 2010).

The existence of the first element is not in dispute. In each case, there was a contract - an exclusive agency agreement - which governed the independent contractor relationship between Allstate and each of the plaintiffs.

The plaintiffs claim that Allstate breached the agreements by not performing the reviews mandated by the agreements and the incorporated manuals. They contend the

---

[32] Defs.' Ex. 30.

[33] Pls.' Ex. 9.

[34] Defs.' Ex. 32.

[35] Defs.' Ex. 37.

[36] Defs.' Ex. 42.

[37] Defs.' Ex. 10.

[38] Defs.' Ex.3.

reviews would have alerted them to the problems they were having with the ALI, giving them the chance to cure or respond to Allstate's complaints. Specifically, had they had the discussions, Smith and Burris could have raised the demographics issue and requested an "exception."

Allstate counters that the plaintiffs' admitted breach of the agency agreement – failing to achieve a passing customer satisfaction score on the ALI - bars recovery for any alleged breach of contract by Allstate. It also claims that Smith and Burris each received appropriate annual performance reviews in 2009 when they were provided the annual Agency Status Review, and in 2010 through the Expected Result Portal and business discussions with Field Sales Leaders. Furthermore, Allstate claims that the ALI improvement programs did not impose a contractual obligation upon Allstate, but rather were non-binding suggestions for Field Sales Leaders.[39] Finally, it argues that it was not contractually obligated to perform semi-annual reviews because this obligation was incorporated into the agency contracts with the 2011 Independent Contractor Manual Revision Notice, after Smith and Burris had breached the agency agreement.

Allstate contends that Smith and Burris failed to meet business objectives established by Allstate, justifying its termination of the agreements. Among these goals are levels of "profitability, growth, retention, customer satisfaction and customer service."[40] According to Smith and Burris, Allstate based its termination decisions on their failure to satisfy the ALI customer satisfaction benchmark. ALI measures overall satisfaction with the agency, likelihood to renew with the agency, and willingness to

---

[39] *See* Adukeh Dep. 69:13-21; 75:3-15; 86:5-87:24.

[40] Agmt. II.B.

recommend the agency.[41] The plaintiffs contend that despite their low ALI scores, they met their requisite objectives and maintained high retention rates. They attribute their low ALI scores to customer dissatisfaction with Allstate for raising insurance rates, and not to their lack of service.

A material breach by one party entitles the non-breaching party to suspend performance of the contract. *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009) (citation omitted). Consequently, a party who has committed a material breach may not insist upon performance of the contract. *Id.* (quotation omitted). On the other hand, an immaterial breach will not excuse the non-breaching party's performance. *Cimina v. Bronich*, 537 A.2d 1355, 1358 (Pa. 1988) (citation omitted). Whether a breach is material is an issue of fact unless the question "admits of only one reasonable answer." *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008).

Whether the failure to achieve the customer satisfaction and service goals, which are not defined in the agreements, is material is a question for the fact-finder. Similarly, it is for the fact-finder to decide whether Allstate's failure to conduct the periodic reviews that would have given Smith and Burris an opportunity to improve their scores amounted to a material breach of the contract.

With respect to the third element, Smith and Burris suffered the loss of their agencies together with the loss of investment capital, their books of business, and income. Allstate argues that because plaintiffs have no expert testimony, damages are

---

[41] Defs.' Ex. 60, 5.

too speculative to proceed to the jury. In other words, it contends that Smith and Burris cannot prove damages without an expert.

The damages are capable of measurement. The businesses had a present and future value. Whether Smith and Burris can prove damages is another question. It may be that at trial they cannot meet their burden, but, at this stage, we cannot conclude that they can or cannot prove damages.

## Conclusion

We shall grant Allstate's motion to dismiss the plaintiffs' section 1981 claim. The plaintiffs have not made out a *prima facie* case of discrimination in contracting. We shall deny the motion to dismiss the breach of contract claims. There are material questions of fact for the jury on the contract cause of action. Therefore, the motion for summary judgment will be granted in part and denied in part.